**In re HOFFINGER INDUSTRIES, INC., Debtor.**

**Hoffinger Industries, Inc., Plaintiff,**

**v.**

**Brad Rinehart, Defendant.**

**No. 2:01–BK–20514M.**

United States Bankruptcy Court, E.D. Arkansas, Helena Division.

April 16, 2004.

Charles R. Camp, Attorney at Law, Charles T. Coleman, Wright, Lindsey & Jennings LLP, Lance R. Miller, Mitchell Law Firm, Leisa Pulliam, Pulliam Law Firm, Stan D. Smith, Mitchell Law Firm, Charles W. Tucker, Little Rock, AR, P. Keith O'Gorman, Burns, O'Gorman, Black & Weyand LLC, San Antonio, TX, Robert J. Wenbourne, Foley & Lardner, Sacramento, CA, Timothy J. Buckley, III, Finley & Buckley P.C., Atlanta, GA, for Debtor.

James F. Dowden, James F. Dowden, P.A., Little Rock, AR, for U.S. Trustee.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On November 15, 2001, Hoffinger Industries, Inc. ("Debtor") filed a complaint for turnover and damages against Brad Rinehart ("Rinehart"), former President and Chief Operating Officer of the Debtor. In its complaint and amended complaint, the Debtor alleges generally that Rinehart, while acting as President, paid himself excess monies by various means, including unauthorized expense reimbursement. The Debtor contends that the monies at issue should be turned over to the Debtor and asks for judgment for all sums not turned over.

On March 19, 2002, Rinehart filed an answer generally denying the allegations of the complaint and a counterclaim asking that any sums he is required to return be determined to be an allowed administrative claim.

The Debtor also filed a motion to reject the employment agreement between the Debtor and Rinehart, and Rinehart has objected. The motion to reject was consolidated for trial with the pending adversary proceeding on February 8, 2002. Trial on the merits of the adversary proceeding and the motion was held on September 23, 2003, and the matters were taken under advisement.

The Court entered an order on October 20, 2003, directing Rinehart to repay the sum of $80,769.22 which was paid to him during the administration of the Chapter 11 case without notice to creditors and without an order of this Court. The order was entered without prejudice to Rinehart's right to file an administrative claim for the same amount. The Court has re-

considered this issue and its conclusions are discussed in Section "A" below.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E) (2000), and the Court has jurisdiction to enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

The Debtor is a closely held corporation owned by members of the Martin Hoffinger family. Although he currently owns no stock in the Debtor, Martin Hoffinger ("Hoffinger") is Chairman and Chief Executive Officer and has held that title since the company was formed in 1945. The Debtor company manufactures above-ground swimming pools at a manufacturing facility in West Helena, Arkansas, with corporate headquarters in California. Hoffinger hired Rinehart as President of the Debtor in December 1998.

Rinehart's duties, compensation and benefits are set out in an employment agreement that was introduced at trial as Plaintiff's Exhibit 3. In general, Rinehart was to receive a base salary of $200,000.00 per year plus a performance bonus. His base salary was raised to $300,000.00 in July 2000. (Tr. at 18.) (Pl.'s Ex. 3.) Rinehart received approximately $90,000.00 as a bonus in July of 2000, but was not entitled to a bonus in 2001.

Rinehart also received a company automobile, and the company agreed to pay all expenses incurred in the operation of the automobile. The company allowed him to select an automobile of his choice, and he chose a BMW valued at $72,680.00. (Tr. at 21.) He was to receive all other company benefits generally available to senior executives, including a one million dollar life insurance policy paid for by the company and payable to Rinehart's family. The policy was to terminate in the event Rinehart was terminated from employment. (Tr. at 19.)

The employment agreement was terminable by either party at any time with not less than 90 days written notice. Rinehart's duties were described as follows:

> Duties—President of the Company and such other positions and responsibilities as the Board of Directors may deem appropriate, but not limited to: (i) the day to day running of the Company in conformance with Board approved policies, as well as operating and capital budgets; (ii) selling raw material and finished goods in the ordinary course of business; (iii) the hiring/firing and salary administration of non-officer Company personnel; and (iv) recommending to the Board budgets and compensation adjustments for all Company officers.

Pl.'s Ex. 3.

The company operated on a fiscal year ending July 31. Rinehart began working for the Debtor on January 4, 1999. The Debtor filed for chapter 11 under the provisions of the Bankruptcy Code on September 13, 2001. Rinehart was terminated by letter dated September 24, 2001, and allowed to continue working during the following ninety days under the provisions of the employment contract. However, pursuant to instructions from Hoffinger, Rinehart vacated the offices of the Debtor on October 12, 2001.

At trial, the Debtor's evidence consisted of live testimony of Rinehart, Hoffinger and other officers of the Debtor. Also introduced was the evidentiary deposition of Jennifer Dunn, who was the company's Chief Financial Officer during the relevant period. The rest of the evidence consisted chiefly of company financial records, including credit card statements.

## GENERAL EXCESSIVE SPENDING

One of the categories of expenditures that the Debtor seeks to recover from Rinehart is the sum of $50,373.84 for excessive spending. The list of items is long and includes monies spent in 1999, 2000, and 2001 as reflected by the Debtor's business records. Some proof of these expenditures is in the record, and some expenditures are discussed by the witnesses, but many of the specific items were not the subject of any testimony.

The expense reimbursement policy was set out in a written memorandum to all employees and stated that employees would be reimbursed for "actual expenses incurred on the company's behalf while the employee is engaged in authorized company business." (Pl.'s Ex. 20.) Requests for reimbursement were submitted to Dunn, the CFO, who would approve expense requests and submit the requests to accounting for payment. The policy contained guidelines concerning business meals, which suggested a $9.00 limit for breakfast, a $15.00 limit for lunch and a $25.00 limit for dinner. As to lodging, the policy was that "you are expected to stay in good hotels or motels, but not necessarily the most fashionable or in accommodations that are larger or more luxurious than necessary." (Pl.'s Ex. 20.)

Dunn testified that she wrote the expense memorandum for Rinehart's signature and that the policy did apply to Rinehart except for any additional spending authority granted by the Board of Directors to purchase large items such as office furniture or equipment. Rinehart testified that he did not specifically remember seeing the memorandum or the policy and that the policy did not necessarily apply to him because "I was following

the same procedure that I had followed the whole time, and no one complained about it or told me to do it any differently." (Tr. at 76.)

Hoffinger testified that he made the decision to fire Rinehart because he was charging expenses to the company that were totally inappropriate. He stated that he did not receive detailed expense reports from Rinehart although he continually requested them throughout the relevant period. He said he finally obtained copies in September 2001 and that the information in the reports precipitated Rinehart's firing.

The evidence is persuasive that the expense reimbursement policy did apply to Rinehart and that he grossly abused the policy. With the exception of Hoffinger and Dunn, the CFO, no one was in a position of authority to challenge Rinehart's expense report because he was the COO. Dunn was a subordinate and obviously declined to challenge Rinehart's decisions on how he characterized his expenditures.[1]

Many of the charges made by Rinehart to company credit cards were for travel expenses incurred in Europe and Asia where the Debtor had customers. These expenses may or may not have been incurred in the process of doing the Debtor's business. The policy regarding employee expense reimbursement is vague and acknowledges that expenses will vary according to circumstances and location. Yet there is no evidence in the record with regard to an appropriate charge for lodging in London or other locations in Europe. The same is true for meal expenses. The record does not contain evidence of the reasonable cost of a meal in Europe,

---

1. There is ample evidence that Dunn did not challenge Rinehart's expense claims and followed his instructions because many of the expenses, on their faces, appear to be totally unrelated to any legitimate business purpose.

and the records are not clear if and when Rinehart was entertaining customers as part of his duties when he charged the company for meals.

The Court has examined each expense challenged by the Debtor, but only those specifically discussed by the testimony will be charged back to Rinehart. Rinehart is entitled to some deference in lodging and meal quality because he was the president of the company.

Rinehart, in his brief, argues that even if some of the expenses should not have been reimbursed, voluntary payments made on demand to satisfy claims not legally enforceable are not recoverable. (Def.'s Post–Trial Brief at 4 (citing *Boswell v. Gillett*, 226 Ark. 935, 295 S.W.2d 758 (1956))).

The fallacy in Rinehart's argument is twofold. First, some of the expense requests made by Rinehart were fraudulent because he misrepresented the true nature of the expense. The most egregious example was designating his daughters' private school tuition as "outside services."

The second fallacy is that the Debtor in this case was acting through Rinehart, its President, who directed Dunn, the CFO, as to which account the charges should be applied. Dunn testified, "This came from Brad [Rinehart] to pay these, and we would categorize it that way and reimburse him back that amount." (Dunn Dep. at 105.) Further, the Court believes Hoffinger's testimony that he had requested but did not receive the proper documentation that would have alerted him to Rinehart's spending practices.

Some of the lavish expenditures cannot be charged back to Rinehart because the evidence is not sufficient to rebut his explanation. Examples of such expenses are purchases of wine and cigars, golf trips for customers costing in excess of $8000.00, and meals and drinks in expensive hotels and restaurants.

*A.*

## POST–BANKRUPTCY PAYMENTS TO BRAD RINEHART

■ The evidence at trial demonstrates that on October 12, 2001, when Rinehart was asked to vacate the company offices, he paid himself $23,076.92 for accrued vacation. He also paid himself $57,692.30 in salary that would be due him during the remainder of the 90–day termination period. The Debtor alleges that these sums should be returned to the company.

The Debtor also alleges that upon his departure, Rinehart owed the company for 6.5 days of vacation equal to the sum of $7499.99 and that Rinehart should reimburse the Debtor $3512.00 for the use of the BMW after October 12, 2001. The Debtor contends that Rinehart owes the company $96,781.21, the total of these four sums.

When the Chapter 11 case was filed on September 13, 2001, Rinehart was advised by a letter from the Debtor's attorney regarding duties and restrictions on business activities in a Chapter 11 case. Among the items discussed in the letter was the restriction of activities outside the ordinary course of business and caution regarding special payments to insiders, such as officers, without prior Court approval.

Rinehart's employment was terminated on September 24, 2001, by Hoffinger in a letter dated September 24, 2001. The employment agreement provided that it was subject to termination by either party on 90 days written notice. The letter states, in part, as follows:

> Effective immediately, you are relieved of your duties as chief operating officer. I will assume those duties. You may

continue in the office as president and your duties will be set forth by me on a day-to-day basis. You will not have the right to make decisions that have any impact on the company without my written approval. Any deviation from this directive will constitute good cause for immediate termination.

At the end of the ninety day period, the leased BMW is to be returned to the company and the keys given to Jennifer Dunn and all other benefits will cease except for those that may be vested.

As an alternative, at your option, you may depart immediately and the company will pay you a lump sum of 3 month's salary, $75,000.00, subject to bankruptcy court approval and the Company will continue your medical insurance for 90 days at which time the Cobra provisions for medical insurance will apply, as well as payments for your other existing benefits. Please advise in writing whether you elect this option.

Bankruptcy counsel has advised that court approval must be obtained to make a lump sum payment to you of $75,000.00 for three month's salary and if you elect this option, court approval will be requested.

Pl.'s Ex. 7.

Rinehart chose to stay with the company for 90 days and retain the company benefits. However, on October 12, 2001, Hoffinger called Rinehart and told him to leave.

Rinehart testified that Hoffinger told him to have checks prepared for "the balance of the 90 days and vacation...." (Tr. at 27.) Rinehart said that Hoffinger told him he had all of the approval he needed to pay Rinehart, and Rinehart assumed Hoffinger meant Court approval. Rine-

hart immediately had checks prepared as follows:

| DATE | PAYEE | AMOUNT |
|------|-------|--------|
| 10/12/01 | Brad Rinehart | $ 23,076.92 ($17,102.17 net to Rinehart) |
| 10/12/01 | Brad Rinehart | $ 57,692.30 ($36,272.77 net to Rinehart) |

Pl.'s Ex. 9, 10.

The employment contract required 90 days written notice before Rinehart could be terminated. The 90 days began to run on September 24, 2001. Rinehart paid himself for the five pay periods remaining in the 90–day period on October 12, and according to Dunn, the calculation would be $300,000.00 (Rinehart's annual salary) divided by 26 pay periods in a year multiplied by five, the number of pay periods remaining in the 90–day period.[2] (Dunn Dep. at 182.) Rinehart's calculation is correct, and he was entitled to $57,692.30 or the balance due under the employment contract. In view of this finding, Rinehart will not be required to return this money but may set off this amount against an equal amount he owes the Debtor for a post-petition payment.

Rinehart also calculated his vacation pay to be a gross of $23,076.92; however, the Debtor's records show that he had a deficit in the vacation account. (See Pl.'s Ex. 8.) Rinehart said he calculated the amount from the Debtor's bankruptcy schedules, which did show $23,076.92 as being a claim of Rinehart, but listed it as disputed. Rinehart offered no evidence to rebut the Debtor's records except his own testimony. He testified that he had no idea if he took vacations in Europe and Hawaii in the year 2000 and that, "I would contest that vacation record. I never saw it. ..." (Tr. at 33.) Rinehart's testimony is not credible. He owes the Debtor the sum of $23,076.92 he paid himself for unearned vacation.

2. $300,000.00 ÷ 26 = $11,538.46 × 5 = $57,692.30.

The Debtor's records demonstrate that Rinehart owed the Debtor for 6.5 vacation days or 52 vacation hours. Rinehart's hourly wage may be calculated by dividing his annual salary, $300,000.00, by 2080, the number of hours worked in a year. (See Dunn Dep. at 179–181.) This calculates to $144.23 an hour. Multiplying $144.23 by 52 vacation hours equals $7499.99. Rinehart owes the Debtor this sum for deficit hours in the vacation account.

Rinehart stated that he returned the company car at the end of December 2001. Ninety days from September 24, 2001, would have been December 23, 2001. Under the terms of the termination letter, Rinehart would have been entitled to keep the car through that day and he testified that he substantially complied. Rinehart does not owe the Debtor for use of the vehicle.

### B.

### *LIFE INSURANCE*

■ As a part of his employment package, the Debtor agreed to pay premiums for one million dollars worth of life insurance with the beneficiary being a member of the Rinehart family. The employment agreement specifically provided that any insurance in excess of one million dollars was to be Rinehart's expense. (Pl.'s Ex. 3.)

Hoffinger testified that Rinehart asked him if he could carry five million dollars in coverage, and Hoffinger replied, "You can carry as much as you want if you pay for the difference." (Tr. at 191.) Notwithstanding Hoffinger's instruction, Rinehart purchased a 4.5 million dollar policy for a premium of $14,165.00 as of September 1, 2001. Prior to that time Rinehart had a $500,000.00 policy for a premium of $695.00. Added together, the premium payments totaled $14,860.00. In September 2001, the Debtor had paid the annual premiums of $14,165.00 and $695.00, and Rinehart was terminated on October 12, 2001.

Rinehart testified that he had a verbal agreement with Ellen Lowe, an officer with the company and a member of the Hoffinger family, to receive $5 million dollars worth of life insurance in spite of the written employment agreement that limits the insurance to $1 million dollars. (Tr. at 191.) Even if Rinehart acquired additional life insurance without authority, the evidence in the record does not establish how much Rinehart owes the Debtor for the extra insurance or the portion of insurance owed as pro-rated to the date of his dismissal. The annual cost for the first million dollars in life insurance would appropriately be born by the Debtor, but no witness testified how to calculate the difference between the cost of premiums for one million and five million dollar policies. Therefore, the Debtor did not meet its burden of proof to establish the amount due from Rinehart.

### C.

### *MEDICAL AND DENTAL EXPENSES*

#### *DENTAL EXPENSES*

■ Rinehart made the following credit card charges for dental expenses which were paid by the Debtor:

| 1. | 04/19/01 | Moody Nicholls, DDS | $4550.00 | (Comerica) |
|---|---|---|---|---|
| 2. | 07/10/01 | Brite Smiles Irvine | 551.60 | (Chase) |
| 3. | 07/12/01 | Moody Nicholls, DDS | 1000.00 | (Chase) |
| 4. | 10/02/01 | Moody Nicholls, DDS | 1100.00 | (Chase) |
| | | TOTAL | $7201.60 | |

Pl.'s Ex. 15, Tr. at 48–50.

The dental plan provided by the company had a $1000.00 maximum annual benefit. (See Pl.'s Ex. 6.) Rinehart testified that the company policy did not apply to him and that Hoffinger told him that he had full coverage for himself and his family. The employment contract states only that Rinehart has the same benefits as other senior officers of the company.

Hoffinger denied that he told Rinehart he could charge more than the company plan allowed and called Rinehart's testimony a fabrication. Dunn stated that Rinehart did not have any special medical and dental coverage. (Dunn Dep. at 67.) She also testified that teeth whitening for $551.60 was not ever a proper medical expense because it is cosmetic. (Dunn Dep. at 109.)

Rinehart's expense for dental work was $7201.60, and the maximum reimbursement allowed by the written policy was $1000.00 per year. Therefore, Rinehart owes the Debtor $6201.60 for dental expense.

### LASIK SURGERY

Rinehart asked Hoffinger if the company would pay for his LASIK eye surgery. On August 6, 1999, Hoffinger rejected the request stating, "I turned down a request by a shareholder to make an exception having the company pay for Lasix surgery. Under these circumstances, I must let it pass." (Pl.'s Ex. 16.) Rinehart proceeded to have the surgery, and Dunn testified that Hoffinger declined to have the company pay for Rinehart's LASIK surgery but permitted the company to pay for it and charge it against his bonus. (Dunn Dep. at 71.) These charges were posted to Rinehart's personal account with the Debtor, which will be discussed below under a heading titled "Personal Account Owed by Rinehart to the Debtor." Similarly, any other expenses in the record that were paid by the Debtor but bearing the '140' code number designating personal expense will be separately catalogued under the "Personal Account" heading.

### D.

### PAYMENTS TO ST. MARY AND ALL ANGELS SCHOOL

Rinehart's two daughters attended a private school in Aliso Viejo, California, called St. Mary and All Angels School ("SMAA"). Tuition was $5220.00 per child per semester. Rinehart also had an account with the school for miscellaneous expenses such as uniforms, yearbooks, field trips, and school supplies. Rinehart charged the following expenses to the Debtor:

| | | | | |
|---|---|---|---|---|
| 1. | 10/05/00 | SMAA Contribution—Pumpkin Sales | $ 750.00 | (Cash Expense) |
| 2. | 03/08/01 | St. Mary's | $ 900.00 | |
| 3. | 04/02/01 | St. Mary's | $ 6000.00 | |
| 4. | 07/05/01 | St. Mary's | $ 5300.00 | |
| 5. | 07/28/01 | SMAA | $ 498.00 | |

| | |
|---|---|
| TOTAL | $13,448.00 |

Pl.'s Ex. 17.

Rinehart made a notation on the statement submitted for payment that the $5300.00 and the $498.00 charges were "outside services." St. Mary's records indicated that the $5300.00 and the $498.00 payments were for tuition for Rinehart's daughters. Rinehart acknowledged on direct examination that the code he placed on the $5300.00 payment "might have been a mistake on my part" and the code he placed on the $498.00 payment "looks like that was mis-coded." (Tr. at 55.) He also admitted that the $498.00 payment was applied to his children's account. (Tr. at 53–61.) Dunn said she was unaware that these payments were for his children's school tuition and that school tuition was not a reimbursable expense.

Rinehart stated that the $6000.00 payment was a charitable contribution on behalf of the company and that the $750.00 payment was also a charitable contribution on behalf of the company involving a pumpkin sale to benefit the school. Rinehart stated he did not know what the $900.00 payment to St. Mary's concerned. He stated that the company budgeted $20,000.00 to $25,000.00 per year for charitable contributions and he had the discretion to spend the money as he saw fit.

In an earlier deposition, Rinehart stated that he did not receive anything as a result of the $6000.00 payment. However, St. Mary's records showed that the $6000.00 payment yielded a reserved parking space for Mrs. Rinehart at St. Mary and All Angels school. (Tr. at 56.) Jennifer Dunn testified that it would have been inappropriate for the company to pay $6000.00 for Mrs. Rinehart's parking space.

Hoffinger testified that the company had no charitable donation policy and that he never gave Rinehart authority to make charitable contributions. However, Dunn said that the company did make donations to charity and that Rinehart had authority to make or approve all charitable contributions. Nevertheless, Rinehart failed to produce any records that indicated these so-called charitable contributions were made on behalf of the Debtor, and the records which were introduced all show the payments benefitted Rinehart and not the Debtor. None of the payments are proper reimbursable business or charitable expenses of the Debtor.

## E.

### OTHER UNAUTHORIZED PERSONAL EXPENSES

Rinehart paid for theater tickets, private club dues, gifts, and extracurricular activities for his children by charging the expense to the Debtor.

The unauthorized purchase of theater tickets included a charge on a company credit card statement of June 4, 2001, for tickets to "Cinderella" for $394.10 and $12.50. Rinehart stated he took his family, Dunn's family and two other company employees to the performance, and he viewed this activity as business-related. On a September 23, 1999, statement Rinehart charged $518.00 and $10.00 ($528.00 total) payable to TicketMaster for "Defending Caveman." Rinehart stated "Defending Caveman" was a play that he, his wife, Dunn and her husband, and another company employee and his wife attended.

He acknowledged charging his monthly athletic club membership and his dues to the Monarch Bay Club to the company. The expense of club memberships is not expressly provided by the company to

Rinehart as a benefit and is not a proper expense to bill to the Debtor. However, the record demonstrates that expenses paid by the Debtor at the Monarch Bay Club were for dining rather than dues. Dining with customers would have been an appropriate business-related expense, and the Court is reluctant to assume otherwise without more evidence.

Rinehart charged a $590.00 payment on the company Chase card on June 2, 2001, to the California Junior Lifeguard program. He designated it as a charitable contribution. Rinehart admitted this payment could have been for his children's participation in the program. (Pl.'s Ex. 18). (Tr. at 63.) Rinehart also charged $358.42 on June 10, 2001, to pay the California Junior Lifeguard program for uniforms for his children. Rinehart testified that this was a legitimate company expense because his children appeared in the uniforms in advertisement brochures for the company. Dunn testified that if these payments were for tuition for Rinehart's children to participate in the program, they were not a reimbursable expense. (Dunn Dep. at 120.)

On October 4, 2001, Rinehart charged the company Chase card $865.00 payable to the Southern California Children's Choir, Newport Beach, California. The expense was coded "Business Meals and Expenses." (Pl.'s Ex. 18.) Rinehart admitted his children participated in the choir, and he saw nothing wrong in causing Hoffinger to make the payment. He had previously made a payment of $70.00 to the choir on the company's Comerica card on September 13, 2000. (Pl.'s Ex. 18.) (Tr. at 66.)

Hoffinger also introduced evidence of various expenses that Rinehart charged to the company that were on their faces for non-business related expenses or authorized expenses and these will be charged back to Rinehart. For example, Rinehart was unable to explain a charge to Disneyland on May 7, 1999. Therefore, Rinehart must repay this charge and the three other Disneyland charges on May 9, 1999. Similarly, he was unable to verify that a credit card charge for gift items purchased from Alumni Support at West Point was for a business purpose, and this expense must also be repaid.

The following expenses, listed below in chronological order, were paid by the Debtor and will be charged back to Rinehart for the reasons discussed above.

| DATE | DESCRIPTION | AMOUNT | |
|---|---|---|---|
| 05/07/99 | Disneyland | $ | 28.02 (Pl.'s Ex. 28) |
| 05/09/99 | Disneyland | $ | 670.60 (Dunn Dep. Ex. 6) |
| 05/09/99 | Disneyland | $ | 610.35 (Dunn Dep. Ex. 6) |
| 05/09/99 | Disneyland | $ | 106.00 (Dunn Dep. Ex. 6) |
| 07/14/99 | Alumni—West Point Gift Items | $ | 41.95 (Pl.'s Ex. 28) |
| 08/17/99 | Health Club, Expense Report | $ | 409.00 (Pl.'s Ex. 28) |
| 08/30/99 | CA Athletic Club | $ | 24.00 (Pl.'s Ex. 28) |
| 08/30/99 | CA Athletic Club | $ | 8.00 (Pl.'s Ex. 28) |
| 09/23/99 | Ticket Master ("Caveman") | $ | 518.00 (Pl.'s Ex. 28) |
| 09/23/99 | Ticket Master ("Caveman") | $ | 10.00 (Pl.'s Ex. 28) |
| 09/29/99 | California Athletic Club | $ | 8.00 (Pl.'s Ex. 25) |
| 09/29/99 | California Athletic Club | $ | 24.00 (Pl.'s Ex. 25) |
| 10/27/99 | CA Athletic Club | $ | 24.00 (Pl.'s Ex. 27) |
| 10/27/99 | CA Athletic Club | $ | 8.00 (Pl.'s Ex. 27) |

| | | | |
|---|---|---|---|
| 11/29/99 | CA Athletic Club | $ 24.00 | (Pl.'s Ex. 27) |
| 11/29/99 | CA Athletic Club | $ 8.00 | (Pl.'s Ex. 27) |
| 01/27/00 | CA Athletic Club | $ 48.00 | (Pl.'s Ex. 28) |
| 01/27/00 | CA Athletic Club | $ 16.00 | (Pl.'s Ex. 28) |
| 09/13/00 | So. Cal. Children's Choir | $ 70.00 | (Pl.'s Ex. 18) |
| 06/02/01 | Jr. Lifeguard | $ 590.00 | (Pl.'s Ex. 18) |
| 06/04/01 | Tickets to "Cinderella" | $ 394.10 | (Pl.'s Ex. 25) |
| 06/04/01 | Tickets to "Cinderella" | $ 12.50 | (Pl.'s Ex. 25) |
| 06/10/01 | Jr. Lifeguard | $ 358.42 | (Pl.'s Ex. 18) |
| 10/04/01 | So. Cal. Children's Choir | $ 868.00 | (Pl.'s Ex. 18) |

TOTAL: $ 4,878.94

## F.

## LUGGAGE

■ In 1999 and 2001, Rinehart purchased luggage for himself and submitted the charges as reimbursable company expense. The charges on the Chase credit card for luggage costing $1159.93 and $134.38 on July 8, 2001, were designated "R & D" (research and development) by Rinehart. (Pl.'s Ex. 23.) When asked why he coded both expenses as "R & D," Rinehart stated he had done so erroneously, but that he thought it was a proper company expense because he traveled extensively on company business. Rinehart admitted he never returned the luggage when he left the company even though he purchased $1159.93 worth of luggage two months before he was fired.

Dunn testified that charges for luggage would not be appropriate reimbursement expenses. The cost of Rinehart's luggage is not a reimbursable business expense any more than the cost of his business suits.

| | | |
|---|---|---|
| 7/03/99 | Richards Luggage Center | $ 430.95 |
| 6/03/01 | Richards Luggage Center | $1,872.18 |
| 7/08/01 | Rootens Luggage Center | $1,159.93 |
| 7/08/01 | Luggage Center | $ 134.38 |

TOTAL $ 3597.44

(Pl.'s Ex. 23.)

## G.

## HOME FURNISHINGS, HOUSEHOLD ITEMS AND SUPPLIES

■ Rinehart charged several items of home furnishings and supplies to the Debtor for his personal use during the year 2000 and 2001. He characterized several of these expenses as "R & D" (Research and Development). The charges include the following:

| | | | | |
|---|---|---|---|---|
| 11/17/00 | Comerica | Contract–Residential | $ 2210.00 | (Unknown) |
| 12/04/?? | Comerica | Leslie's Pool Supply | $ 1077.41 | (Salt) |
| 12/13/?? | Comerica | Lowe's | $ 635.90 | (Patio Heater) |
| 12/14/?? | Comerica | Capo Valley Fireside | $ 2075.00 | (Hearth Supplies) |
| 04/24/01 | Chase | Frontgate Catalog | $ 612.86 | (Torches) |
| 04/25/01 | Chase | Frontgate Catalog | $ 866.79 | (Torches) |
| 05/10/01 | Chase | Frontgate Catalog | $ 1838.77 | (Patio Heater) |

| 05/11/01 | Chase | Frontgate Catalog | $ | 325.52 | (Patio Heater) |
| 05/14/01 | Chase | Frontgate Catalog | $ | 119.51 | (Patio Heater) |
| 05/29/01 | Chase | Orchard Supply | $ | 59.86 | (Unknown) |
| 06/16/01 | Chase | House to Home | $ | 1779.07 | (Patio Furniture) |
| 06/17/01 | Chase | The Home Depot | $ | 750.35 | (Patio Furniture) |
| 08/25/01 | Chase | Orchard Supply | $ | 91.36 | (Operating Supplies) |

TOTAL $12,442.40

Pl.'s Ex. 21.

Orchard Supply is a hardware store in California, and Rinehart testified that he had no idea what he purchased there on May 29, 2001, and August 2, 2001. The credit card statement for the August purchase describes the item as "operating supplies." (Tr. at 96.) The charges at Frontgate on April 24, 2001 and April 25, 2001, were for outdoor torches Rinehart kept on the grounds of his home, and the charges at Frontgate on May 10, 11, and 14, 2001, were for patio heaters used in the area around Rinehart's in-ground pool at his residence. On June 16 and 17, 2001, Rinehart purchased patio furniture for his pool area from House to Home and the Home Depot and charged the items to the company.

He testified that the purchase from Leslie Pool Supply charged to Comerica on December 4 (Undetermined year) for $1077.41 was for salt used in a "demo unit of a bromine generator called Bromatron ... I put that on my pool at home to test it ... I ran it for probably six to eight months." (Tr. at 83.) In December of either 1999 or 2000, Rinehart charged to the company Comerica card patio heaters at Lowe's for $635.90 and hearth supplies at Capo Valley Fireside for $2075.00, merchandise used at his home. Rinehart had no recollection of a business or personal reason for the $2210.06 Comerica charge on November 17, 2000, to Contract–Residential. (Tr. at 108.)

Dunn testified that it was inappropriate for Rinehart to charge the Debtor for items to be used at his residence. Rinehart testified that many of the items he purchased for use at his home were actually for testing and product development for the company. (Tr. at 172.) This testimony is not credible. The Debtor manufactures above-ground swimming pools, not patio heaters, torches, patio furniture, hearth supplies, or bromine generators. Furthermore, as Hoffinger testified, testing new products was not within the scope of the duties of the Chief Operating Officer of the Debtor.

## H.

### INTERNET CHARGES

■ The Debtor supplied Rinehart with a computer for use at home. Rinehart subscribed to various web sites, access to which was paid for with the company credit cards. Charges for these services included the following:

| NAME | CREDIT CARD | AMOUNT | | DATE |
|------|-------------|--------|---|------|
| Cybernet Ventures | Amer. Express | $ | 19.95 | 3/04/1999 |
| Web Quest | Amer. Express | $ | 2.95 | 3/12/1999 |
| Friend Finder | Amer. Express | $ | 39.95 | 3/12/1999 |
| Friend Finder | Amer. Express | $ | 45.95 | 8/16/1999 |
| Friend Finder (personal ad) | Amer. Express | $ | 39.95 | 11/22/1999 |

| | | | | |
|---|---|---|---|---|
| Friend Finder | Comerica | $ | 49.95 | 1/09/2001 |
| CCB*98CC | Comerica | $ | 64.95 | 1/09/2001 |
| WMV, Alternative Connect | Comerica | $ | 49.95 | 1/16/2001 |
| CCB*98CC | Comerica | $ | 64.95 | 4/10/2001 |
| WMV* Alternative Connect | Comerica | $ | 16.95 | 4/15/2001 |
| Friend finder | Comerica | $ | 16.95 | 4/15/2001 |
| WMV* Alternative Connect | Comerica | $ | 16.95 | 6/15/2001 |
| CCB*98CC | Comerica | $ | 64.95 | 7/09/2001 |
| WMV* Alternative Connect | Comerica | $ | 16.95 | 7/15/2001 |
| | TOTAL | $ | 511.30 | |

Pl.'s Ex. 19.

When confronted with the charges, Rinehart denied knowing the nature of the web sites and testified as follows:

Q. What is the web site Friend Finder, Mr. Rinehart?

A. I think Friend Finder is just a chat site.

Q. It's a what?

A. It's just a chat site, to talk to people across the country. I think I've been on it, but I don't really re-member.

Q. In fact, it's a pornographic site; isn't it, Mr. Rinehart?

. . .

Q. On the first one, Mr. Rinehart, let's start with item number five, Cyber-net VNTRS, $19.95. Do you see that site?

A. (Consulting document) I see it.

Q. Is that a pornographic site?

A. I have no idea. This is from March of 1999. I don't recall that.

. . .

Q. And if we look at Cybernet VNTRS, you do know that will come up with a pornographic site; don't you, Mr. Rinehart?

A. I have no idea.

Q. We may just have to figure that out. Web Quest—number nine, do you know what Web Quest is?

A. No, I don't.

Q. The company was charged $2.95 for that, and you also coded it to web access, correct?

A. Yes.

. . .

Q. Did you have a handle where you had to access Friend Finder, a code name?

A. I probably had a password.

Q. What was your password; would it be "Rinobeme"?

A. That's possible.

Q. For Friend Finders, your access was Rinobeme; correct?

A. Okay.

Q. In fact, that's a pornographic site; is it not, Mr. Rinehart?

A. I said that's possible. I don't spe-cifically recall.

. . .

Q. WMV–ALTE for $49.95, Mr. Rine-hart, do you know what WMV–ALTE stands for?

A. No, I don't.

Q. Is that also a pornographic web site?

A. I don't know.

Q. Do you know if the ALTE stands for alternative?

A. No, I don't.

Q. An alternative pornographic web site, you don't know that that's what that is?

A. No. I don't recall that.

Q. ... On the next page, we have a transaction of 4–10, $64.95 for CCB–98CC. Do you see that?

A. I see it.

Q. Do you know what that's for?

A. No idea.

Q. You don't know whether that's a pornographic web site or not?

A. No.

Tr. at 67–73.

Rinehart agreed that his internet web site usage was personal and did not involve company business and that he did not know "how these sites were coded within the company." (Tr. at 74.) Rinehart also agreed that he should pay the company back. These charges total $511.30.

## I.

### UNAUTHORIZED FAMILY TRAVEL

■ Rinehart traveled extensively when he served as president of the Debtor. The company policy regarding travel was set out in a memorandum from Rinehart dated September 30, 1999. The policy stated that if a family member accompanied the employee, "[a]dditional expenses arising from such non-business travel are the responsibility of the employee." (Pl.'s Ex. 20.)

Notwithstanding company policy, Rinehart took his wife, Cathy Rinehart, and sometimes his children, Christi and Natalie, on trips and charged their expenses to the Debtor. Dunn testified that she did not recall approving any travel expenses for Rinehart's family. Furthermore, Rinehart charged expenses for trips made by his wife and children that were not related to any business trip. He even charged air fare for round trip travel taken by his wife and a non-family member from California to North Carolina. Some of the charges were discussed in the testimony, while others simply appear on statements entered into the record as exhibits.

These inappropriate charges include:

| | | |
|---|---|---|
| 8/03/00 | Three Tickets for Cathy, Christi and Natalie Orange County, CA to Chicago, Return 8/28/00 | $ 1839.00 |
| 11/02/00 | Three Tickets for Cathy, Christi and Natalie Orange County, CA to Orlando, Fl., Return 11/7/00 | $ 798.00 |
| 12/20/00 | Four Tickets for Brad, Cathy, Christina and Natalie Orange County, CA to Chicago and Return 12/28/00 ($1044.00 − 261.00 (Rinehart's ticket) = 783.00) | $ 783.00 |
| 1/27/01 | Three Tickets for Cathy, Christi and Natalie Orange County, CA to San Francisco, Return 1/29/01 | $ 388.50 |
| 4/25/01 | Two Round Trip Tickets for Cathy Rinehart and Linda Goveia—Orange County, CA to Greensboro, NC and return 4/29/01 | $ 961.00 |
| 5/01/01 | One Round Trip Ticket for Cathy Rinehart Orange County, CA to Louisville, KY | $ 319.00 |
| 5/17/01 | Four Round Trip Tickets for Brad, Cathy, Christi and Natalie—Orange County, CA to San Francisco Return 5/20/01 | $ 558.00 |

7/18/01 Three Round Trip Tickets for Cathy, Christi and
 Natalie—Orange County, CA to Chicago Return
 8/12/01 $ 1134.50 [3]

 TOTAL $ 6781.00

Pl.'s Ex. 24.

## J.

### THE SAN FRANCISCO TRIP

█ Rinehart took his entire family on a trip to San Francisco, leaving May 17, 2001, and returning May 20, 2001. He charged the air fare for himself and his family to the company in the sum of $558.00. (See Unauthorized Family Travel above; See also Pl.'s Ex. 24.) The following expenses of this trip were also charged as business expenses:

| 5/17/01 | Chase | Yellow Cab | $ | 39.00 |
| 5/17/01 | Chase | Lori's Diner | $ | 80.06 |
| 5/19/01 | Chase | Lori's Diner | $ | 34.88 |
| 5/19/01 | Chase | Westin Hotel (S.F.) | $ | 67.10 |
| 5/21/01 | Chase | Sir Francis Drake Hotel | $ | 2,128.19 |
| | | TOTAL | $ | 2,349.23 |

Pl.'s Ex. 18.

Rinehart designated the Lori's Diner charges as "business meals and expenses" and the Westin Hotel and Sir Francis Drake Hotel charges as "lodging." When questioned about the expenses, Rinehart denied that the expenses were for a family vacation, and he said that he did not recall if his family accompanied him or not. When he examined the documents, he remembered his family traveled with him to San Francisco, but stated he was working on the trip. He said he thought his two daughters, ages 9 and 11, stayed in his room.

None of these charges appear on their faces to be business-related. According to the flight itinerary supplied by the travel agency, the trip was Thursday to Sunday. The Debtor's records reflect that Rinehart was on vacation Thursday, May 17, and Friday, May 18, 2001, and these days were charged against his ten-day a year vacation allotment. (Pl.'s Ex. 8.) If the trip was a bona fide business trip, Rinehart would have had no reason to report to the company that he was on vacation. Rinehart offered no evidence to substantiate his claim that these expenses were business-related other than his testimony, which was not credible. Therefore, Rinehart owes the Debtor all expenses incurred on the trip, including his own airfare.

## K.

### TRIPS TO EUROPE

Rinehart made several trips to Europe accompanied by his wife. He billed the expenses of these trips to the Debtor as business expenses.

Some of these trips were not discussed in detail in the testimony, but were evidenced by the Plaintiff's financial records.[4] Rinehart admitted that he made the determination that his wife's expenses on the trips to Europe would be charged to the company. (Tr. at 178.) He testified that his wife's expenses were justified because,

---

3. Rinehart had previously purchased three tickets for his family for $1134.50 and exchanged them for other tickets totaling $1873.50 with the $739.00 difference charged to his 140 account with the Debtor. See Plaintiff's Exhibit 24, Request for Check to Action Travel.

4. Rinehart testified that his wife accompanied him on a trip to Europe in 1999 and that the company paid her round trip air fare on Lufthansa for $1179.78. See Plaintiff's Exhibit 28, American Express statement.

"My wife was actually very helpful to have around.... She handled herself well.... Having a woman with you I always found to be very important and helpful.... She helped develop a relationship with accounts." (Tr. at 178–179.)

There was substantial testimony and documentary evidence relating to the trip to London and Monte Carlo from July 27– August 12, 2001, about six weeks before Rinehart received his termination letter. In preparation for the July trip, Rinehart, on June 24, 2001, drew a $5000.00 cash advance from the Debtor. (Pl.'s Ex. 33.)(Tr. at 100–101.) Rinehart purported to account for the $5000.00 cash advance on a handwritten expense report. (Pl.'s Ex. 34.)

According to the travel agency invoice and itinerary, Rinehart and his wife departed Chicago on Virgin Atlantic Airlines at 5:00 p.m. on July 27, 2001, and arrived at London Heathrow Airport at 6:55 a.m. on July 28, 2001. His wife's air fare was $3140.47. His itemized cash report accounting for the $5000.00 showed $12.00 for lunch and $42.00 for dinner on July 27, 2001, even though the travel agency invoice reflected a meal served in flight and a departure time of 5:00 p.m.

When Rinehart and his wife landed in London they were housed at the Ritz Hotel at the rate of 265 £ per night, according to the Action Travel itinerary.[5] On August 1, 2001, Rinehart's cash expenditures included 98 £ for train tickets. Also on August 1, 2001, a charge of $135.67 to Thames Trains, Ltd. appeared on the Comerica credit card. This charge ap-

pears to be a duplication of the item in the cash expense report. (Pl.'s Ex. 21.)

On August 4, 2001, the Rineharts flew to Nice, France and traveled on to Monte Carlo, Monaco. The Rineharts were lodged at the Hotel Hermitage at the rate of 2886.21 FF per night.[6] On August 5, Rinehart spent 366 FF for lunch in France.

Rinehart's cash expense report reflects that he spent 320 FF for lunch and 210 FF for drinks on August 6, 2001. On August 7, he spent 400FF for lunch, 200FF for drinks, and $46.42 on the company credit card paid to "casino" and designated as an employee meal. On August 8, 2001, he spent 1182 FF for lunch and 420 FF for drinks. On the same day, he coded charges at La Cave Des Ver for $314.58 and Gaidoz for $263.39 as business meals and entertainment and a charge of $54.23 to PH Cannes as an employee meal. On August 9, 2001, he charged 320 FF for lunch and 620 FF for dinner. He spent 300 FF for lunch on August 10, 2001, even though Rinehart and his wife left France on August 10, 2001, at 11:20 a.m. on a flight that included lunch.

Rinehart charged his hotel bill in Monte Carlo on August 10, 2001, in the sum of $2657.12, even though the Debtor had already paid a cash deposit to the hotel for $2539.64 on June 24, 2001. (Pl.'s Ex. 24.) On August 7, 2001, while Rinehart was in Monte Carlo, he purchased $2500.00 in traveler's checks (Pl.'s Ex. 21) charged to the company credit card, which he falsely designated as lodging expense. Rinehart never accounted for the $2500.00 in travel-

**5.** The exchange rate shown on the handwritten expense report was $1.52 = 1 British Pound (£). (Pl.'s Ex. 34.) Using this exchange rate, the room cost $402.80 per night.

**6.** The exchange rate reflected in the cash report was $100.00 equals 142.85 FF. ($1.00 U.S. = 14.28 FF). (Pl.'s Ex. 34.)

er's checks or the $2539.64 advance deposit.

When Rinehart checked out of the Ritz to fly to Nice, he paid the hotel bill for seven nights lodging totaling $2785.57 (1945.26 £) by a charge on the Comerica card on August 4, 2001. (Pl.'s Ex. 28.) This sum is calculated to be $397.93 per night. He also paid the Ritz for the nights of August 10, 2001 and August 11, 2001, with a charge on the Comerica card on August 12, 2001, of $1606.10 or $803.05 per night. The difference in the room rate is unexplained by the record. The Debtor had previously paid a cash deposit to the Ritz for $3377.45 on June 22, 2001, for Rinehart. (Dunn Dep. Ex. 15.) Rinehart has never accounted for the $3377.45 advance deposit to the Ritz.

While in London, Rinehart also charged the company credit cards for purchases at antique stores and at Harrod's, a fine department store in the city. Rinehart's testimony when questioned about these expenses was not credible. He claimed he did not know what was purchased at the Mirabelle and stated that he did not recall if he purchased any antiques at Bartlet Street Antiques Center in Bath, England. He said Bartlet could have been a restaurant. He said he did not recall Durham House Antiques.[7]

He said he did not remember the charges at Portobello Antiques in London for $136.40 or Station Mill Antiques for $257.23, which was coded to his personal account. Rinehart acknowledged that he coded the charge to Cottage Collectibles for $168.19 as "employee meals" and stated that "a lot of those places have restaurants inside the store area." (Tr. at 93.) He admitted that the $638.51 charge to Atlam was to an antique store and that it was coded for business meals and entertainment, but he could not remember if "there's a restaurant in there or not." (Tr. at 94.)

He ultimately acknowledged that he had bought antiques on the trip and charged them to the Debtor, and that a Comerica statement entry for September 6, 2001, to Simon Hall Exports for $743.70 was the amount charged "for shipping some stuff back" from England to his home in California. (Tr. at 96.) He charged this expense to the Debtor but coded the charge to his personal account with the Debtor.

During Rinehart's stay in London, he made numerous purchases at Harrod's totaling $1560.74 in charges to company credit cards. He stated that some purchases were for chocolates and teas for his office employees, but most of the charges he designated as meals.

Rinehart's testimony about the activity of August 10 and 11 is particularly incredible. His cash expenses report reflects lunch on August 10, 2001, in France for 300 FF and a lunch in England on the same day for 35 £. Also on that day, he flew from France, leaving at 11:20 a.m. and arriving in England at 12:25 p.m. local time on a flight that served lunch.[8] Later

---

7. On another trip to England in 2000 he charged the Debtor for antiques. On August 12, 2000, he made purchases of $504.25 from Atlam Sales, and on August 13, 2000, he charged $57.67 in purchases from Wallace Crafts, which he coded to his personal account. (Pl.'s Ex. 28.) He also purchased antiques at Atlam on February 10, 2001, for

$874.94 and charged the items to the Debtor. (Pl.'s Ex. 27.)

8. The Travel Action itinerary called for Rinehart to depart France on Saturday, August 11, 2001, rather than Friday August 10, 2001. But in view of the charges made in London on the 10th, the Court infers from this that he took the same flight, only a day early.

the same day, he ate at Harrod's to the tune of $61.76 and $52.63 coded as meals and $829.15 coded as business meals and expenses. In sum, Rinehart purports to have consumed six meals on August 10 costing well in excess of $1000.00.

On August 11, 2001, he coded charges at Harrod's for $47.48, $26.05 and $109.08 as meals, and his cash report for the same date also reflects meal expenses of 35 £. On August 12, 2001, he claimed $32.29 for a meal at Harrod's and cash expense of 40 £ for lunch even though his flight left London at 10:30 a.m. and, according to the itinerary, also served lunch.

The evidence is convincing that the trip from London to Monte Carlo was not a business related trip. Hoffinger testified that Rinehart's duties should not have required him to be outside the office except to attend trade shows and to entertain. He said that the company sales manager was to take care of foreign sales. Hoffinger stated that he could not think of any reason for Rinehart to travel to the South of France or to Monte Carlo on business. (Tr. at 223.)

Furthermore, the company records demonstrate that Rinehart took annual vacation for the days of August 6–10, 2001. Rinehart would have had no reason to report to the company that he was on vacation if the trip to France was a bona fide business trip. Therefore, none of the expense of the trip to France is an appropriate business expense.

Expenses for the side trip to France that are not properly charged to the company include the following credit card charges:

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 8/08/01 | La Cave Des Ver | $ 314.58 |
| 8/08/01 | Gaidoz | $ 263.39 |
| 8/08/01 | Casino | $ 46.42 |
| 8/08/01 | PH Carnes | $ 54.23 |
| | TOTAL | $ 678.62 |

Pl.'s Ex. 28.

The cash expenses for the stay in Monte Carlo included:

| | |
|---|---|
| 8/05/01 | $ 107.85 |
| 8/06/01 | $ 142.86 |
| 8/07/01 | $ 115.71 |
| 8/08/01 | $ 327.42 |
| 8/09/01 | $ 185.71 |
| 8/10/01 | $ 128.57 |
| TOTAL | $1008.12 |

Pl.'s Ex. 34.

The total of Rinehart's credit card charges and cash expenditures in Monte Carlo is $1686.74, as documented by Plaintiff's Exhibits 28 and 34.

Therefore, based on the foregoing discussion, Rinehart must repay the following charges he claimed as business expenses during trips to Europe:

| | | |
|---|---|---|
| 1. | Wife's Airfare 1999 | $ 1179.78 |
| 2. | Atlam Sales—8/12/00 | $ 504.25 |
| 3. | Atlam Sales—2/10/01 | $ 57.67 |
| 4. | Wife's Airfare 2001 | $ 3140.47 |
| 5. | Duplicate Train Ticket—August 1, 2001 | $ 135.67 |
| 6. | Traveler's Checks | $ 2500.00 |
| 7. | Advance to Hermitage Hotel unaccounted for | $ 2539.64 |
| 8. | Advances to Ritz Hotel unaccounted for | $ 3377.45 |
| 9. | Wife's Meal Expenses | $ –0–[9] |

**9.** There is no evidence in the record that could form the basis for calculating an amount that Rinehart's wife spent on meals improperly charged to the company.

10. Miscellaneous charges in London

| | | | | |
|---|---|---|---|---|
| 7/29/01 | Comerica | The Mirabelle, London | $ | 233.86 |
| 7/31/01 | Comerica | Bartlet St. Antiques, Bath | $ | 237.53 |
| 8/01/01 | Chase | Durham House Antiques | $ | 291.12 |
| 8/02/01 | Chase | Cottage Collectibles | $ | 168.19 |
| 8/10/01 | Comerica | Harrods | $ | 139.87 |
| 8/10/01 | Chase | Harrods | $ | 61.76 |
| 8/10/01 | Chase | Harrods | $ | 52.63 |
| 8/10/01 | Chase | Harrods | $ | 829.15 |
| 8/11/01 | Comerica | Atlam, London | $ | 638.51 |
| 8/11/01 | Chase | Harrods | $ | 47.48 |
| 8/11/01 | Chase | Harrods | $ | 26.05 |
| 8/11/01 | Chase | Harrods | $ | 109.08 |
| 8/12/01 | Chase | Harrods | $ | 32.29 |

11. Hotel Expense in Monte Carlo $ 2657.12

12. Miscellaneous expenses incurred in Monte Carlo $ 1686.74

TOTAL $20,646.31

## L.

### TRIPS TO HAWAII

Rinehart testified that he took a family vacation to Hawaii each year in November. He traveled to Hawaii in November 1999, 2000 and 2001.[10] Rinehart stated that he charged the 1999 and 2000 trips and some expenses for the 2001 trip to the company.

Only a few expenses relating to November Hawaiian vacations in 1999 and 2000 were evidenced in the record. These expenses included:

| | | | | | |
|---|---|---|---|---|---|
| Ex. 19 | 11/22/99 | Maui, HI | Am. Express | $ | 130.00 |
| Ex. 19 | 11/24/99 | Plantation Course Kapalua, HI | Am. Express | $ | 17.71 |
| Ex. 19 | 11/24/99 | Bay Course, Lahaina, HI | Am. Express | $ | 191.65 |
| Ex. 19 | 11/24/99 | Plantation House, Kapalua, HI | Am. Express | $ | 51.75 |
| Ex. 24 | 11/24/00 | Hertz, Kahului, HI | Comerica | | 623.96 |

TOTAL $ 1015.07

The Debtor also alleges that Rinehart charged to the Debtor a family trip to the Grand Wailea in Hawaii in 2000, but the only exhibit to substantiate the allegation is illegible. (See Pl.'s Ex. 24, Comerica statement.) Similarly, a hotel bill prepaid by the Debtor on March 6, 2001 in the sum of $2841.11 to the "KSL–Gran" appears to have been related to a May 2001 business trip and not to the November 2001 vacation when the Rineharts were lodged at the Grand Wailea. (Tr. at 118, Pl.'s Ex. 30.)

The records on the November 2001 trip show that Rinehart, on March 9, 2001, charged the Debtor $2250.00 for pre-paid, round trip tickets from Los Angeles to Honolulu for his wife and children. (Pl.'s Ex. 24.)

Dover Pools and Supplies paid the Grand Wailea in Maui the sum of $8600.00 on September 26, 2001. Dover Pools was

---

10. Dunn testified that she knew Rinehart took his family on vacation to Hawaii but thought the tickets were paid for by frequent flyer points. She testified that his family expenses were not reimbursable expenses. (Dunn Dep. at 144.)

a customer of the Debtor whose employee was planning to vacation with the Rineharts and paid this expense in Rinehart's name. The Dover Pool employee did not make the trip and Rinehart used the deposit toward his expenses. Rinehart stated that he has reimbursed the Dover Pool customer. Hoffinger's records indicate that in August 2000, a $24,000.00 debt owed by Dover to Hoffinger was written off. Rinehart agrees that he owes the Debtor the expenses charged to the Debtor for this vacation.

Rinehart took vacation time from November 17 through 22, 1999, and November 19 through 22, 2000. All of the Hawaii charges related to these vacations will, therefore, be disallowed as business expense because if the trips to Hawaii were bona fide business trips there would be no reason for Rinehart to charge his own account for vacation accrual. Rinehart attempts to justify charging expenses from his family vacation to Hawaii to the Debtor by claiming he worked during his vacation. He said he "used to spend three full days [in November] of that trip writing over 700 or 800 Christmas cards with personal notes to all of our customers, our key employees and some of our suppliers." (Tr. at 174.)

This explanation is not credible for several reasons. Writing 700 Christmas cards is a task easily delegated to a secretary and is not a duty of a COO of a company the size of the Debtor. Second, Rinehart offered no evidence to corroborate his testimony and third, there is no legitimate reason why Rinehart had to travel to Hawaii with his family to find a suitable location to write Christmas cards. Rinehart's testimony is simply not believable. Rinehart has offered no substantive corroborating evidence to his testimony that he was actually performing his duties as President of the Debtor while in Hawaii.

Rinehart must repay $1015.17 for the 1999 and 2000 Hawaiian vacations and $2250 in air fare for the 2001 vacation, for a total of $3265.07.

### M.

### DUPLICATE EXPENSES–REIMBURSEMENT CHARGES

 Rinehart's expense records were examined by the Debtor to determine if any expenses were double billed to the company. By charging the expense on the company credit card and then submitting the same expense as if he had paid it with cash, Rinehart was reimbursed for expenses he never actually incurred.

| DATE | NAME | DESCRIPTION | CHARGE AMOUNT | AMOUNT DUE |
|------|------|-------------|---------------|------------|
| 1/14/1999 | Lodging | Amer. Express | $ 211.45 | |
| 1/13/1999 | Lady Luck, MS | Expense Report 1152 | $ 211.45 | $ 211.45 |
| 1/11/1999 | Hertz Rent-a-car Memphis | Amer. Express | $ 215.99 | |
| 1/15/1999 | Auto Rental | Expense Report 1152 | $ 215.99 | $ 215.99 |
| 1/15/1999 | Other Auto | Expense Report 1152 | $ 27.95 | |
| 1/15/1999 | Shell Oil | Amer. Express | $ 27.95 | $ 27.95 |
| 1/16/1999 | Fax Machine | Expense Report 1152 | $ 282.27 | |
| 1/17/1999 | Charge to Staples | Amer. Express | $ 282.27 | $ 282.27 |
| 1/18/1999 | Dinner (reps and HII Employees) | Expense Report 1153 | $ 871.95 | |
| 1/18/1999 | La Strada, LV | Amer. Express | $ 871.95 | $ 871.95 |
| 1/18/1999 | Hertz Rent A Car Memphis | Amer. Express | $ 193.95 | |

| Date | Description | Source | Amount | Amount |
|---|---|---|---|---|
| 1/22/1999 | Auto Rental | Expense Report 1153 | $ 193.95 | $ 193.95 |
| 1/22/1999 | Treasure Island | Amer. Express | $ 719.07 | |
| 1/22/1999 | Lodging | Expense Report 1153 | $ 719.07 | $ 719.07 |
| 1/25/1999 | Golden Lantern | Amer. Express | $ 26.00 | |
| 1/25/1999 | Other Auto | Expense Report 1300 | $ 26.00 | $ 26.00 |
| 1/27/1999 | Auto Rental | Expense Report 1300 | $ 189.24 | |
| 1/28/1999 | Hertz Rent–A–Car Memphis | Amer. Express | $ 189.24 | $ 189.24 |
| 2/09/1999 | Shell Oil | Amer. Express | $ 21.75 | |
| 2/14/1999 | Other Auto | Expense Report 1154 | $ 21.75 | $ 21.75 |
| 2/15/1999 | Bell's Ducks Helena Food | Amer. Express | $ 318.04 | |
| 2/15/1999 | Product Dev. Dinner | Expense Report 1154 | $ 318.04 | $ 318.04 |
| 2/15/1999 | Best Western | Amer. Express | $ 119.49 | |
| 2/17/1999 | Lodging | Expense Report 1154 | $ 119.49 | $ 119.49 |
| 2/18/1999 | Sheraton | Amer. Express | $ 112.85 | |
| 2/18/1999 | Lodging | Expense Report 1154 | $ 112.85 | $ 112.85 |
| 2/20/1999 | Other Auto | Expense Report 1154 | $ 40.41 | |
| 2/20/1999 | Unocal | Amer. Express | $ 40.41 | $ 40.41 |
| 2/22/1999 | Lunch–Marketing | Expense Report 1156 | $ 26.95 | |
| 2/22/1999 | Chg. to Old Spaghetti | Amer. Express | $ 26.95 | $ 26.95 |
| 2/24/1999 | Lunch, Sales | Expense Report 1156 | $ 25.95 | |
| 2/24/1999 | El Torito Food | Amer. Express | $ 25.95 | $ 25.95 |
| 2/27/1999 | Lunch, brand-mkg | Expense Report 1156 | $ 337.96 | |
| 2/27/1999 | Grand Café' | Amer. Express | $ 337.96 | $ 337.96 |
| 2/27/1999 | Other Auto | Expense Report 1156 | $ 33.00 | |
| 2/27/1999 | Chevron | Amer. Express | $ 13.00 | |
| 2/28/1999 | Chevron | Amer. Express | $ 20.00 | $ 33.00 |
| 3/16/1999 | Mobil | Amer. Express | $ 23.00 | |
| 3/16/1999 | Other Auto | Expense Report | $ 23.00 | $ 23.00 |
| 3/19/1999 | Keith Hardy, GW | Expense Report 1158 | $ 22.57 | |
| 3/19/1999 | Perko's | Amer. Express | $ 22.57 | $ 22.57 |
| 3/19/1999 | Phone, Postage | Expense Report 1159 | $ 15.06 | |
| 3/19/1999 | RSN & Associates | Amer. Express | $ 15.06 | $ 15.06 |
| 3/20/1999 | ATT Cellular | Amer. Express | $ 14.00 | |
| 3/20/1999 | Phone, Postage | Expense Report 1158 | $ 14.00 | $ 14.00 |
| 3/21/1999 | Crown BK | Amer. Express | $ 29.05 | |
| 3/21/1999 | Phone Postage | Expense Report 1159 | $ 29.05 | $ 29.05 |
| 3/21/1999 | Other Auto | Expense Report 1159 | $ 27.00 | |
| 3/21/1999 | Golden Lantern | Amer. Express | $ 27.00 | $ 527.00 |
| 12/7/2000 | Pebble Beach | Expense Report 1316 | $ 695.00 | |
| 12/7/2000 | Pebble Beach | Comerica | $ 695.00 | $ 695.00 |
| 6/01/1999 | Brad Rinehart Family Dental Costs | Hoffinger Check | $ 123.00 | |
| 6/04/1999 | Brad Rinehart | Expense Check | $ 123.00 | $ 123.00 |

TOTAL $4,722.95

Even though it was Rinehart who would have submitted the duplicate charges, he testified, "It was certainly not done on purpose and if the Accounting Department made that error, then they made that error." (Tr. at 132.) He also testified that he should not have to pay these sums back and he was "shocked they [the auditors] didn't catch it." (Tr. at 132.) Rinehart's explanation is ludicrous and he owes the Debtor for these duplicate expenses.

### N.

### *PERSONAL AUTOMOTIVE EXPENSES*

■ On August 31, 2001, Rinehart charged the Debtor's Chase card $1079.56 to McLauren Unibody for the repair of his wife's car. (Tr. at 111.) The Debtor furnished Rinehart with a car and agreed to pay the expense of operation but did not agree to furnish Rinehart's wife a car or pay the expense of operation. Rinehart

testified he was using his wife's car on company business and in doing so damaged the car. (Tr. at 111.) (Pl.s Ex. 22). Under these circumstances, the repair bill was not a company expense because there is no testimony the company ever agreed to pay damage claims on his wife's car.

### O.

### PERSONAL ACCOUNT OWED BY RINEHART TO THE DEBTOR

The Debtor allowed certain employees to maintain accounts with the Debtor for personal items paid for by the Debtor. Rinehart had such an account which was coded '140' while Account Number 68 was the code for company travel expenses. (Dunn Dep. at 112.) Dunn Deposition Exhibit 13 is a summary of Rinehart's debt to the company as of January 2002 for amounts designated as follows:

| | |
|---|---|
| Brad money wire | $ 233.68 |
| Per. Chg toward Bonus Brad | $ 948.25 |
| U–Jentz—Brad battle plan | $ 407.50 |
| TOTAL | $1589.43 |

Dunn Dep. Ex. 13.

The Debtor's records indicate that these sums were not paid by Rinehart, but were charged off to bank fees. (Dunn Dep. at 150.) Dunn testified that it would not be appropriate to write the fees off in this fashion and that she does not know who did it. She said the handwritten notes appeared to be in "Laura's" handwriting. (Dunn Dep. at 152.)

Mike Malone, the Chief Financial Officer who replaced Dunn, testified on behalf of the Debtor. Plaintiff's Exhibit 29 is a reconciliation of a general ledger account for monies owed by employees to the Debtor. As of June 2001, Rinehart owed the company $18,872.25 calculated in one account and $9554.41 calculated in another account, and presumably both sums resulted from items paid by the Debtor and designated under the 140 code or as personal expenses by Rinehart and/or the company accounting department. The $18,872.25 was for items charged toward Rinehart's bonus, but he was not entitled to receive a bonus in 2001. The $9554.41 was labeled "Mastercard B. Rinehart (Eyes)." (Pl.'s Ex. 29.) The Court draws the inference that this account included the charges for Rinehart's LASIK surgery.

These accounts were charged off by transferring $9554.41 to a manufacturing department and charging $18,872.25 to the product department. Malone testified that these accounting transfers were made at the end of the fiscal year in July 2001.

Dunn also testified about the 140 account and Rinehart's account for travel. She corroborated the Debtor's records as to the meaning of the 140 account. Her testimony is as follows:

Q. Did you approve that? Did you approve that getting transferred from Brad's bonus to now getting paid to travel?

A. You know, that number I—I don't recall.

But I do recall having to go and sit down with him and go over the spread sheet and being told that was for, you know—you know, this was a trip to Memphis, this was a trip to Tunica, this was whatever and determining what was—should have been a business expense as opposed to a personal expense. And that would have been told to me from Mr. Rinehart.

(Dunn Dep. at 91–92.)

Rinehart testified that he had never seen the Debtor's record of the 140 ac-

count and said he never paid any of the money due on the account because he never knew it was due. He said he had no idea why the balance in one account went from $18,872.25 in June of 2001 to $181.90 in July 2001. He said, "They probably cleared that up. They'd probably dumped items into that account that didn't belong there." (Tr. at 157.)

Rinehart's testimony is unbelievable because code 140 appears beside some of his credit card purchases that he admits were personal. The Court finds that Rinehart owes the Debtor $9554.41 and $18,872.25. The Court infers that these sums will include, but are not limited to, the charges for Rinehart's LASIK eye surgery as well as all other charges evidenced in the record that he coded to account 140 until July 31, 2001.

The record does not disclose all of the entries that make up the total owed by Rinehart on his accounts with the Debtor. Rinehart testified that "I would sit down with her [Dunn] occasionally and see what was not coded correctly and get it adjusted." The Court believes Rinehart adjusted his 140 account to diminish substantially all of the amounts owed.

The Court has perused the various exhibits in the record and catalogued the items coded to the 140 account both before and after July 31, 2001. As stated, these items do not account for the total amounts the Debtor's records reflected were due from Rinehart to the Debtor as of June 2001. Also, there is no document in the record showing how much the Debtor paid for Rinehart's LASIK surgery, the cost of which is presumably included in one of the totals.

## CHARGES CODED TO BRAD RINEHART ACCOUNT 140

| EXHIBIT | DATE | CHARGE | DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 28 | 6/12/99 | Comerica | Richard's Luggage | $ 522.48 |
| 28 | 6/12/99 | Comerica | Brookstone Merchandise | $ 140.08 |
| 28 | 6/12/99 | Comerica | The Container Store | $ 46.26 |
| 28 | 6/13/99 | Comerica | Duty Free Store | $ 151.50 |
| 28 | 5/14/99 | Comerica | Continental Airlines | $ 445.02 |
| 28 | 5/14/99 | Comerica | Continental Airlines | $ 445.02 |
| 28 | 5/14/99 | Comerica | Continental Airlines | $ 445.02 |
| 27 | 8/02/99 | American Express | Ryder Rental | $ 145.26 |
| 28 | 9/10/99 | Comerica | Golden Gate Tickets | $ 700.00 |
| 28 | 8/13/00 | Comerica | Wallace Crafts | $ 57.67 |
| 28 | 8/13/00 | Comerica | Richoux | $ 57.30 |
| 28 | 8/16/00 | Comerica | National Science and Industry | $ 106.50 |
| 24 | 9/08/00 | Comerica | Continental Airlines | $ 189.00 |
| 24 | 9/08/00 | Comerica | Continental Airlines | $ 189.00 |
| 24 | 9/08/00 | Comerica | Continental Airlines | $ 189.00 |
| 28 | 9/25/00 | Comerica | Cybernet Ventures | $ 78.90 |
| 28 | 9/25/00 | Comerica | Cybernet Ventures | $ 29.95 |
| 28 | 9/25/00 | Comerica | Howard Curtain Call | $ 78.90 |
| 28 | 9/30/00 | Amer. Ex. | San Francisco Opera | $ 732.00 |
| 28 | 5/13/01 | Comerica | The Ritz Carlton | $ 264.35 |
| 28 | 5/15/01 | Comerica | WMV–ALT | $ 16.95 |
| 18 | 5/19/01 | Chase | W. H. Smith | $ 42.18 |
| 24 | 6/20/01 | Invoice 106200217 | Continental Airlines | $ 739.50 |

140 ACCOUNT CHARGES IN TRIAL EXHIBITS PRIOR TO 7/ 31/01 $5,811.84

| | | | | |
|---|---|---|---|---|
| 21 | 7/31/01 | Comerica | Friend Finder | $ 49.96 |
| 15 | 8/01/01 | Chase | Station Mill Antiques | $ 257.23 |
| 21 | 8/11/01 | Comerica | Portobello Antique Co. | $ 136.40 |
| 21 | 8/15/01 | Comerica | WMV–ALT Connect | $ 16.95 |
| 21 | 8/31/01 | Comerica | Friend Finder | $ 49.95 |
| 19 | 9/06/01 | Comerica | Simon Hall Export | $ 743.70 |
| 19 | 9/15/01 | Comerica | WMV–ALT Connect | $ 16.95 |

140 ACCOUNT CHARGES IN TRIAL EXHIBITS AFTER 7/31/01/01 $ 1271.14

## REJECTION OF EXECUTORY CONTRACT

The Debtor and Rinehart entered into an employment contract on July 13, 2000. The contract provided that the Debtor would pay Rinehart a salary and provide certain specific benefits, including use of an automobile, in consideration for Rinehart's performance of specified duties as President and Chief Operating Officer of the Debtor. The contract provided that it was terminable by either party, "at any time, with at least ninety days written notice." (Pl.'s Ex. 3.)

The Debtor argues that the employment contract was a pre-petition executory contract which it rejected post-petition; therefore, any claim Rinehart has under the contract is a general unsecured claim and is not an administrative claim with higher priority.

The Bankruptcy Code provides:

(a) except as provided in section 765 and 766 of this title ... the trustee, subject to the court's approval, may assume or reject an executory contract

. . .

(g) Except as provided in subsection (h)(2) and (i)(2) of this section, the rejection of an executory contract ... of the debtor constitutes a breach of such contract ...

11 U.S.C. § 365 (2000).

 As stated in a leading treatise on bankruptcy, "If the contract is rejected the estate will lose any benefit from the contract and will be liable for damages for the breach; in this situation, the claim for damages is treated as a pre-petition claim." 3 Collier on Bankr.¶ 365.03[2] (Alan N. Resnick & Henry J. Sommer, et al. eds., 15th ed. rev.1993).

 In a Chapter 11 case, the Debtor "may assume or reject an executory contract ... at any time prior to confirmation of a plan." 11 U.S.C. § 1123(b)(2)(2000); 3 Collier on Bankr.¶ 365.04[2]. Unless rejection is contained in a Chapter 11 plan provision, assumption may be accomplished by motion. 3 Collier on Bankr. ¶ 365.04.

 Rejection of an executory contract is not the same thing as termination of a contract. 3 Collier on Bankr. ¶ 365.09[3]; *Eastover Bank for Sav. v. Sowashee Venture (In re Austin Dev. Co.)*, 19 F.3d 1077, 1082 (5th Cir.1994). The Debtor had the right to terminate Rinehart's contract for any reason, but only after 90 days written notice. The Debtor served the written notice on September 24, 2001, and under the contract, Rinehart was entitled to his salary and benefits for 90 more days. The fact that Hoffinger ordered Rinehart off the premises before the 90 day period expired is legally beside the point. The automatic stay did not prevent the Debtor from terminating the employment contract and it did so. Therefore, there is no executory contract to reject; the contract expired by its own terms be-

fore the matter was brought before the Court.

Under the contract, the Debtor owes the unpaid salary and benefits for the entire 90 days after notice of termination was given on September 24, 2001.

## SUMMARY

In summary, for the reasons stated herein, Rinehart is indebted to the Debtor in the following amounts:

| | | | |
|---|---|---|---|
| A. | Post Bankruptcy Payments: | | |
| | Unearned Vacation Pay | $ | 23,076.92 |
| | Vacation Account Deficit | $ | 7,499.99 |
| B. | Life Insurance | | –0– |
| C. | Medical and Dental Expenses | $ | 6,201.60 |
| D. | Payments to St. Mary's School | $ | 13,448.00 |
| E. | Unauthorized Personal Expenses | $ | 4,878.94 |
| F. | Luggage Expense | $ | 3,597.44 |
| G. | Home Furnishings, Household Items | $ | 12,442.40 |
| H. | Internet Charges | $ | 511.30 |
| I. | Unauthorized Travel Expense for Family | $ | 6,781.00 |
| J. | San Francisco Trip Food, lodging, transportation | $ | 2,349.23 |
| K. | Trip to Europe including antique purchases | $ | 20,646.31 |
| L. | Trips to Hawaii for Brad Rinehart and Family | $ | 3,265.07 |
| M. | Duplicate Expense Charges | $ | 4,722.95 |
| N. | Personal Automobile Repair Expense | $ | 1,079.56 |
| O. | Personal Account No. 140 | | |
| | 140 Charges after 7/31/2001 | $ | 18,872.25 |
| | Charge Off to Bank Fees | $ | 9,554.41 |
| | | $ | 1,271.14 |
| | | $ | 1,589.43 |
| | TOTAL: | $ | 141,787.94 |

Therefore, the Debtor's complaint for turnover is granted and the Debtor shall have judgment against Rinehart in the amount of $141,787.94.

. IT IS SO ORDERED.